PRERAK SHAH
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

MICHAEL S. SAWYER, Trial Attorney
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-514-5273 || 202-305-0506 (fax)
Michael.Sawyer@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, | ) Case No. 3:17-cv-00013-SLG |
| Plaintiff, | ) |
| v. | ) **FEDERAL DEFENDANTS'** |
| DAVID L. BERNHARDT, Secretary of the Interior, *et al.*, | ) **MEMORANDUM IN SUPPORT** )  **OF THEIR CROSS-MOTION** ) **FOR SUMMARY JUDGMENT** ) **AND IN OPPOSITION TO** |
| Federal Defendants, | ) **PLAINTIFFS' MOTION FOR** ) **SUMMARY JUDGMENT** |
| and | ) **REGARDING THE FWS KENAI** ) **RULE** |
| ALASKA WILDLIFE ALLIANCE, *et al.*, | ) |
| Intervenor-Defendants. | ) **Oral Argument Requested** |
| SAFARI CLUB INTERNATIONAL, | ) Case No. 3:17-cv-00014-SLG |
| Plaintiff, | ) |
| v. | ) |
| DAVID L. BERNHARDT, Secretary of the Interior, *et al.*, | ) )  ) |
| Federal Defendants, | ) |
| and | ) |
| ALASKA WILDLIFE ALLIANCE, *et al.*, | ) |
| Intervenor-Defendants. | ) |

*State of Alaska v. Bernhardt,* Case No. 3:17cv13 (SLG)
FWS Kenai Rule

| | |
|---|---|
| ALASKA PROFESSIONAL HUNTERS ASSOCIATION, *et al.*, | )<br>)<br>) Case No. 3:17-cv-00026-SLG |
| Plaintiffs, | ) |
| v. | ) |
| DAVID L. BERNHARDT, Secretary of the Interior, *et al.*, | )<br>)<br>) |
| Federal Defendants, | ) |
| and | ) |
| ALASKA WILDLIFE ALLIANCE, *et al.*, | )<br>) |
| Intervenor-Defendants. | ) |

## FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT <u>REGARDING THE FWS KENAI RULE</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND .............................................................................................. 1

    I.     Congress Created the Kenai National Wildlife Refuge With the Principal Purpose of Conserving Fish and Wildlife in Their Natural Diversity. ...................................................................................... 1

    II.    After Consulting With the State, the Service Adopted Conservation Plans for Managing the Kenai Refuge. ........................................... 3

    III.   The National Wildlife Refuge System Improvement Act of 1997 Governs Compatibility Determinations on the Kenai Refuge. .................... 7

    IV.   The Service Has Long Permitted Hunting Black Bears With the Use of a Dog or Over Bait, a Hunting Practice Deemed Compatible With the Purposes of the Kenai Refuge. ................................................ 9

    V.    After the Alaska Board of Game Upset Longstanding Hunting and Trapping Restrictions, the Service Passed the Kenai Rule to Maintain the Status Quo. ........................................................................ 11

LEGAL STANDARDS ................................................................................. 16

ARGUMENT.................................................................................................. 17

    I.     Kenai Plaintiffs Cannot Challenge the Restrictions on Dog-Assisted Big Game Hunting, Which Have Been in Place for Over Three Decades. ................................................................................ 17

    II.    The Service's Skilak WRA Restrictions Should Be Upheld. ..................... 20

         A.   The record supports the Service's determination that increased hunting in the Skilak WRA would reduce opportunities for non-consumptive use.................................................................... 21

         B.   The Service can restrict hunting activities on the Kenai Refuge for reasons beyond conservation, such as public safety.................. 23

         C.   The Improvement Act does not require the Service to allow unrestricted hunting throughout the entirety of the Kenai Refuge. ........................................................................ 27

    III.   The Service's Firearm Discharge Restrictions Should Be Upheld. ............ 30

IV.   The Service's Brown Bear Baiting Restriction Should Be Upheld. ........... 32

V.    The Court Need Not Reach the Meaning of "Natural Diversity" Under
      ANILCA. ...................................................................................................... 36

VI.   The Service Appropriately Analyzed Environmental Considerations
      Under NEPA. ............................................................................................... 38

      A.   NEPA encourages the use of categorical exclusions so that
           agencies can focus their resources on assessing the
           environmental impacts of significant actions. ................................... 38

      B.   NEPA procedures do not apply to most challenged aspects of
           the Kenai Rule. .................................................................................... 40

      C.   The Kenai Plaintiffs' NEPA arguments are waived. ....................... 41

      D.   The Service appropriately determined that the Kenai Rule was
           subject to categorical exclusions under NEPA. ............................... 43

      E.   Any flaw in the Service's NEPA approach is harmless. .................. 44

CONCLUSION ..................................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) ........................................................................... 43

*Bowman Transp. v. Ark.–Best Freight Sys.*,
419 U.S. 281 (1974).......................................................................................... 45

*Brazil v. U.S. Dep't of the Navy*,
66 F.3d 193 (9th Cir. 1995) ............................................................................. 18

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) ......................................................................... 47

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019)...................................................................................... 33

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004).......................................................................................... 41

*Finnegan v. Citi*,
703 F. App'x 625 (9th Cir. 2017) ................................................................... 18

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
611 F.3d 692 (10th Cir. 2010) ......................................................................... 35

*Havasupai Tribe v. Robertson*,
943 F.2d 32 (9th Cir. 1991) ............................................................................. 43

*Kazarian v. U.S. Citizenship & Immigration Servs.*,
596 F.3d 1115 (9th Cir. 2010) ......................................................................... 47

*Kootenai Tribe of Idaho v. Veneman*,
313 F.3d 1094 (9th Cir. 2002) ......................................................................... 40

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ........................................................................... 16

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).......................................................................................... 19

*McFarland v. Kempthorne*,
545 F.3d 1106 (9th Cir. 2008) ......................................................................... 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*,
463 U.S. 29 (1983)............................................................................................ 45

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007).................................................................................... 35, 46

*Nat'l Mining Ass'n v. Zinke,*
    877 F.3d 845 (9th Cir. 2017) ........................................................................... 35

*Nevada v. United States,*
    221 F. Supp. 2d 1241 (D. Nev. 2002) ............................................................... 47

*Ninilchik Traditional Council v. United States,*
    227 F.3d 1186 (9th Cir. 2000) ........................................................................... 37

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) .......................................................... 16, 22, 31, 32

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.,*
    117 F.3d 1520 (9th Cir. 1997) ........................................................................... 46

*Perez-Guzman v. Lynch,*
    835 F.3d 1066 (9th Cir. 2016) ........................................................................... 17

*River Runners for Wilderness v. Martin,*
    593 F.3d 1064 (9th Cir. 2010) ........................................................................... 17

*Sabine River Authority v. Interior,*
    951 F.2d 669 (5th Cir. 1992) ............................................................................. 40

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ..................................................................................... 20, 41

*Wind River Min. Corp. v. United States,*
    946 F.2d 710 (9th Cir. 1991) ........................................................................ 17, 18

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................... 16

**Statutes**

16 U.S.C. § 3125(3) .................................................................................................. 23

16 U.S.C. § 3202(c) .................................................................................................. 27

16 U.S.C. § 668dd(a)(2) ............................................................................................. 8

16 U.S.C. § 668ee ....................................................................................................... 9

28 U.S.C. § 2401(a) .................................................................................................. 17

42 U.S.C. § 4332(c) .................................................................................................. 38

42 U.S.C. §§ 4321–4370m-12 .................................................................................. 38

5 U.S.C. § 551(13) .................................................................................................... 37

5 U.S.C. § 702 .......................................................................................................... 37

5 U.S.C. § 706 ............................................................................................... 45

5 U.S.C. § 706(2)(A) ..................................................................................... 16

5 U.S.C. §§ 701–706 ..................................................................................... 16

Pub. L. No. 105–57, 111 Stat. 1,252 (1997) ................................................... 7

Pub. L. No. 89–669, 80 Stat. 927 (1966) ........................................................ 8

Pub. L. No. 96-487, 94 Stat. 2,371, 2,391 (1980) .......................................... 2

**Regulations**

40 C.F.R. § 1500.4(p) ................................................................................... 40

40 C.F.R. § 1501.4 ........................................................................................ 39

40 C.F.R. § 1502.1 ........................................................................................ 39

40 C.F.R. § 1507.3(b)(2) ......................................................................... 38, 39

40 C.F.R. § 1508.11 ...................................................................................... 39

40 C.F.R. § 1508.9 ........................................................................................ 39

40 C.F.R. §§ 1500.1–1517.7 ......................................................................... 38

50 C.F.R. § 32.2(h) ....................................................................................... 36

50 C.F.R. § 36.39(i)(5)(i) ............................................................................. 15

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) ............................................................ 38

48 Fed. Reg. 34,263 (July 28, 1983) ............................................................. 39

51 Fed. Reg. 32,329 (Sep. 11, 1986) .............................................................. 9

58 Fed. Reg. 5065,5069 (Jan. 19, 1993) ....................................................... 36

6 Fed. Reg. 6,471 (Dec. 18, 1941) .................................................................. 2

78 Fed. Reg. 66,061 (Nov. 4, 2013) ................................................................ 6

81 Fed. Reg. 27,030 (May 5, 2016) ................................................................. 1

H.R. Rep. No. 105-106 (1997), *reprinted in* 1997 U.S.C.C.A.N. 1798-5 .......... 7

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ADF&G | Alaska Department of Fish and Game |
| ANILCA | Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487 (Dec. 2, 1980), 94 Stat. 2,371 |
| APA | Administrative Procedure Act |
| Board | Alaska Board of Game |
| CCP | Comprehensive Conservation Plan |
| CE | Categorical Exclusion |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |
| GMU | Game Management Unit |
| Improvement Act | National Wildlife Refuge System Improvement Act of 1997, Pub. L. 105–57 (Oct. 9, 1997), 111 Stat. 1,252 |
| Kenai Plaintiffs | State of Alaska and Safari Club International |
| Kenai Refuge | Kenai National Wildlife Refuge |
| Kenai Rule | Refuge-Specific Regulations; Public Use; Kenai National Wildlife Refuge, 81 Fed. Reg. 27,030 (May 5, 2016) |
| Mot. | Pls.' Mem. in Supp. of Mot. for Summ. J., ECF No. 171 |
| NEPA | National Environmental Policy Act |
| NWRSAA | National Wildlife Refuge System Administration Act of 1966, Pub. L. No. 89–669 (Oct. 15, 1966), 80 Stat. 927 |
| Safari Club | Safari Club International |
| Service | U.S. Fish and Wildlife Service |
| Skilak WRA | Skilak Wildlife Recreation Area |
| State | State of Alaska |

## INTRODUCTION

This brief concerns a rule promulgated by the Federal Defendants: Refuge-Specific Regulations; Public Use; Kenai National Wildlife Refuge (Kenai Rule), 81 Fed. Reg. 27,030 (May 5, 2016). Plaintiffs State of Alaska (State) and Safari Club International (Safari Club) (collectively, the Kenai Plaintiffs)[1] claim that four provisions in the Kenai Rule are unlawful and unjustified intrusions into state authority over wildlife takings.

In reality, however, the Kenai Rule simply sought to maintain longstanding practices on the Kenai National Wildlife Refuge (Kenai Refuge) that had been developed decades ago, after consultation with State agencies. Consistent with Congressional mandates governing the U.S. Fish and Wildlife Service (Service), those practices accommodate *all* purposes for which the Kenai Refuge was established, not just hunting. Those purposes include environmental education, wildlife viewing, and conservation of all species, including bears and wolves. Because the Kenai Rule appropriately furthers those purposes and is amply supported by the record before the Service, it should be upheld.

## BACKGROUND

I. **Congress Created the Kenai National Wildlife Refuge With the Principal Purpose of Conserving Fish and Wildlife in Their Natural Diversity**.

The Kenai National Moose Range—the precursor to the Kenai Refuge—was established by President Franklin D. Roosevelt for the purpose of "protecting the natural breeding and feeding range of the giant Kenai moose on the Kenai Peninsula, Alaska,

---

[1] The Plaintiffs in Case No. 3:17-cv-00026-SLG, including the Alaska Professional Hunters Association and the Sportsmen's Alliance Foundation, do not challenge the Kenai Rule.

which in this area presents a unique wildlife feature and an unusual opportunity for the study in its natural environment of the practical management of a big game species that has considerable local economic value." Executive Order 8979; *see* 6 Fed. Reg. 6,471 (Dec. 18, 1941).

In 1980, Congress redesignated the Kenai National Moose Range as the Kenai National Wildlife Refuge. Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, § 303(4)(A) (Dec. 2, 1980), 94 Stat. 2,371, 2,391. That name change reflected the expanded conservation purpose of the Kenai Refuge, which Congress broadened from focusing on moose to cover "fish and wildlife populations and habitats in their natural diversity, including, but not limited to . . . bears, . . . wolves and other furbearers." *Id.* § 303(4)(B)(i). At that time, Congress also added approximately 240,000 acres of public lands to the Refuge, *id.* § 303(4)(A), and prescribed additional purposes for the Kenai Refuge beyond conservation:

> (B) The purposes for which the Kenai National Wildlife Refuge is established and shall be managed, include—,
>
>> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, moose, bears, mountain goats, Dall sheep, wolves and other furbearers, salmonoids and other fish, waterfowl and other migratory and nonmigratory birds;
>>
>> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
>>
>> (iii) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge;

> (iv) to provide in a manner consistent with subparagraphs (i) and (ii), opportunities for scientific research, interpretation, environmental education, and land management training; and
>
> (v) to provide, in a manner compatible with these purposes, opportunities for fish and wildlife-oriented recreation.

*Id.* § 303(4)(B).

When enacting ANILCA, Congress further ordered the Secretary of the Interior to prepare "a comprehensive conservation plan" for each refuge after "consult[ing] with the appropriate State agencies and Native Corporations." *Id.* § 303(g). That plan must, *inter alia*, "designate areas within the refuge according to their respective resources and values," "specify the uses within each such area which may be compatible with the major purposes of the refuge," and "set forth those opportunities which will be provided within the refuge for fish and wildlife-oriented recreation, ecological research, environmental education and interpretation of refuge resources and values, if such recreation, research, education, and interpretation is compatible with the purposes of the refuge." *Id.*

## II.    After Consulting With the State, the Service Adopted Conservation Plans for Managing the Kenai Refuge.

Between 1980 and 1985, the Service engaged in an extensive public involvement process in order to develop the initial Comprehensive Conservation Plan (CCP) for the Kenai Refuge. *See* FWL14427–29. That public involvement process involved consultation with numerous state agencies and local governments, including the Alaska Department of Fish and Game (ADF&G). *Id.* at FWL14427.

To enhance coordination between the State and the Service, the Service and the ADF&G agreed to a Master Memorandum of Understanding in 1982. FWL1551–54. In that Master Memorandum, the ADF&G recognized "the Service as the agency with the responsibility . . . on Service lands in Alaska to conserve fish and wildlife and their habitats and regulate human use." FWL1552. Both parties to the Master Memorandum agreed that "the taking of fish and wildlife by hunting, trapping, or fishing on Service lands in Alaska is authorized in accordance with applicable State and Federal law unless State regulations are found to be incompatible with documented Refuge goals, objectives, or management plans." FWL1553–54. The ADF&G also agreed to "manage fish and resident wildlife populations in their natural species diversity on Service lands." FWL1552. Pursuant to that Master Memorandum, the State "provided the Service with a set of draft resource management recommendations for the Kenai Refuge" to consider in developing its initial CCP. FWL14427.

In developing that CCP, the Service prepared an Environmental Impact Statement that analyzed five alternatives—ranging from maximum use to wilderness—before settling on an intermediate management approach that emphasized all species of wildlife. FWL14244–48. Whereas fish and wildlife management under the maximum use alternative "would concentrate on populations of high utility species (principally moose and salmon) to sustain harvests at high levels," FWL14245, the wilderness alternative would limit hunting and trapping "to allow natural processes to be the primary determinant of the composition of wildlife populations," FWL14248. After consultation with the State, the Service ultimately adopted an intermediate alternative (Alternative C),

FWL14226, that allowed continued hunting and trapping "consistent with state and federal regulations" while maintaining "[p]opulations of predators . . . at relatively natural levels in relation to prey," FWL14246. Under the adopted alternative, "[f]ish and wildlife management would emphasize all species of wildlife, although special interest species such as moose, wolves, trumpeter swans, and salmon may receive special consideration." *Id.*

The adopted alternative also permitted hunting and trapping to occur in most areas of the Kenai Refuge, except for limited areas where "[p]ublic safety would be enhanced through . . . closures to firearm discharge." FWL14382. Those hunting-limited areas included high-use "areas where public safety is a concern (i.e., campgrounds, the headquarters/visitor center in Soldotna, etc.)" and "the Skilak Loop Special Management Area." FWL14224, 14382.

The Skilak Loop area "was first recognized as a unique recreational opportunity in 1958," when it was excluded from oil and gas leasing. FWL14258. Given its "variety of habitats, wildlife species, and scenic vistas . . . , all of which are road accessible to a majority of Alaskan residents and tourists," the Service identified the Skilak Loop area "as a special area to provide the opportunity for environmental education and interpretation and outstanding wildlife-oriented recreation on the refuge." *Id.* Accordingly, the Service worked "in cooperation with the Alaska Department of Fish and Game" to develop an operational plan for the Skilak Loop Special Management Area. FWL14229.

That operational plan "identified specific goals for providing wildlife viewing and interpretation opportunities" and restricted "hunting and trapping opportunities . . . so wildlife would become more abundant, less wary, and easily viewed."  FWL982.  "The Service worked closely with the Alaska Department of Fish and Game (ADF&G) to develop regulatory proposals that prohibited trapping, allowed taking of small game by archery, and provided a moose hunt by special permit."  *Id.*  "In 1987, the Alaska Board of Game [Board] approved these regulations that provided a framework for achieving the wildlife population objectives for enhanced wildlife viewing opportunities."  *Id.*

Based on that cooperative approach, the Service developed public use facilities over a 17-year period to "further support development of wildlife viewing, environmental education, and interpretation opportunities in the Skilak area."  *Id.*  "Improvements to existing and development of new visitor facilities occurred in ensuing years as funding permitted, and included new and improved roads, scenic turn-outs, campgrounds, hiking trails, interpretive panels and information kiosks, viewing platforms and boat launches." Notice of Hunting and Trapping Restrictions Within the Skilak WRA, 78 Fed. Reg. 66,061, 66,062–63 (Nov. 4, 2013).  While those improvements were being made, the Service renamed the Loop Special Management Area as the Skilak Wildlife Recreation Area (Skilak WRA).  FWL982.

In 2005, the Board "adopted regulations providing for the use of firearms to hunt small game and fur animals in the Skilak WRA" but delayed implementation of those regulations to allow "the Service to prepare a Skilak WRA Management Plan."  *Id.*  The Service then rejected a broader alternative of a "general entry firearm hunt," FWL1043,

in favor of a limited youth-only small game hunt in the Skilak WRA using appropriate firearms, FWL1054–57. That recommendation was embodied in the 2007 Skilak WRA Management Plan.

While hunting and trapping opportunities in the Skilak WRA are limited under the 2007 Skilak WRA Management Plan, the Skilak WRA is only 44,000 acres of the 1.9 million-acre Kenai Refuge. FWL13570–71. That means the Skilak WRA occupies approximately 2 percent of the Kenai Refuge, leaving "over 97 percent of the Refuge" available for hunting and trapping. FWL13571.

In 2010, the Service updated its CCP, adding numerous planning objectives and goals in light of the Kenai Refuges multiple purposes. *See* FWL1068–1169.

### III. The National Wildlife Refuge System Improvement Act of 1997 Governs Compatibility Determinations on the Kenai Refuge.

Many national wildlife refuges outside Alaska are principally managed under the National Wildlife Refuge System Improvement Act of 1997 (Improvement Act), Pub. L. No. 105–57 (Oct. 9, 1997), 111 Stat. 1,252. In enacting that law, Congress observed that "unlike National Parks, National Forests and Bureau of Land Management lands, the National Wildlife Refuge System remains the only major Federal public lands system without a true 'organic' act, a basic statute providing a mission for the System, policy direction, and management standards for all units of the System." H.R. Rep. No. 105-106, at 3 (1997), *reprinted in* 1997 U.S.C.C.A.N. 1798-5, 1798-7. Because refuges within the system had been created under a variety of authorities—from executive orders to specific acts of Congress to administrative establishment by the Secretary of the

Interior under a number of different statutes—there was an "inconsistency in the management of refuges within the System." *Id.* at 1–2.

While the National Wildlife Refuge System Administration Act of 1966 (NWRSAA), Pub. L. No. 89–669 (Oct. 15, 1966), 80 Stat. 927, gave "guidance to the Secretary of the Interior in the overall management of the [National Wildlife Refuge] System," it did "not establish a mission for the System or contain any planning requirements." *Id.* at 2–3. Since the enactment of NWRSAA, the Refuge System had "grown considerably" from "300 refuges totaling 28 million acres" in 1966 to "more than 500 refuges totaling more than 92 million acres" in 1997. *Id.* at 2. Congress thus enacted the Improvement Act in order to "build[] upon the NWRSAA in a manner that provides an organic act for the System similar to those which exist for other public lands." *Id.* at 3. Under the Improvement Act, the mission of the Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).

While the Improvement Act serves as an organic act for most national wildlife refuges, the Improvement Act treats refuges in Alaska somewhat differently. Section 7 of the Improvement Act establishes a refuge conservation planning program that excludes "refuge lands in Alaska," which are instead "governed by the refuge planning provisions" of ANILCA. 111 Stat. at 1257–59. And section 9 of the Improvement Act governs statutory construction with respect to Alaska, such that ANILCA controls if there is any

*State of Alaska v. Bernhardt,* Case No. 3:17cv13 (SLG)
FWS Kenai Rule                                                                                                    8
Case 3:17-cv-00013-SLG   Document 179   Filed 03/09/20   Page 16 of 56

conflict between a provision of the Improvement Act and a provision of ANILCA. *Id.* at 1260.

One relevant aspect of the Improvement Act that applies to refuges in Alaska, however, is the process for compatibility determinations set forth in section 6 of the Improvement Act. Section 6 directs the Secretary of the Interior not to "initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use and that the use is not inconsistent with public safety." 16 U.S.C. § 668dd(d)(3)(A)(i). A "compatible use" is a "wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee.

IV.     **The Service Has Long Permitted Hunting Black Bears With the Use of a Dog or Over Bait, a Hunting Practice Deemed Compatible With the Purposes of the Kenai Refuge.**

Shortly after adopting the 1985 CCP for the Kenai Refuge, the Service published regulations governing hunting practices on the refuge. *See* Kenai National Wildlife Refuge; Resource Protection Regulations, 51 Fed. Reg. 32,329 (Sep. 11, 1986). In relevant part, those regulations prohibited hunting big game other than black bears with a dog. *Id.* at 32,333 ("Hunting with the aid or use of a dog for taking big game is permitted only for black bear, and then only under the terms of a special use permit from the Refuge Manager."). As the Service noted in the 1985 CCP, "[d]iseases and parasites can be transmitted from domestic animals to wildlife and vice versa." FWL14261. The

regulations also required hunters to obtain a "special use permit" from the Refuge Manager "prior to baiting black bears." 51 Fed. Reg. at 32,333. The regulations noted that federal permitting was "necessary to insure visitor safety on the refuge by preventing baiting in high public use areas and by preventing the proliferation of garbage and litter" because the State did "not have a system regulating the baiting of black bears." *Id.* at 32,330.

After the Improvement Act passed in 1997, the Service undertook a compatibility determination for the practice of baiting black bears. FWL65–72. That Determination recognized that baiting black bears "is a long-term permitted hunting practice on the Refuge" subject to "public concern and controversy," while "[b]rown bear hunting over bait [is] illegal." FWL66. The relevant data for hunting black bears over bait showed that approximately 10 black bears per year were taken over bait on the Kenai Refuge, out of a Kenai Peninsula population estimated to be 3,000 bears. FWL68–69.[2] Thus, the Service concluded that there "currently are no conservation concerns for Kenai area black bears and no reason to further restrict baiting or other practices to meet biological goals." FWL69.

The Service noted, however, several other concerns about the practice of hunting black bears over bait. While the Service noted ethical concerns raised by some commenters, it declined to let those ethical concerns affect its decision. FWL68, FWL70. The Service similarly noted a passing concern that baiting rules prioritized hunting over

---

[2] On the entire Kenai Peninsula, an average of 271 black bears were taken per year of which an average of 53 are taken over bait (approximately 20 %). FWL68.

other wildlife recreation activities. FWL68 ("some find it contradictory for managers to prohibit the feeding of wildlife on one hand (for example to photograph bears or moose up close) but allow the practice to shoot them over bait"). Finally, the Service analyzed safety concerns, noting the "potential concern for human and non-target bear safety around the bait station" due to increased human-bear interactions as an "issue" that "deserves additional attention." FWL70. Ultimately, the Service determined that hunting black bears over bait on the Kenai Refuge had an "insignificant population impact," which supported its conclusion that "impacts associated with the activity do not cross the threshold of compatibility." FWL71.

While the Service found the practice of black bear baiting to be compatible with Kenai Refuge purposes, it did not allow State baiting regulations to control baiting activity on the refuge. Rather, it restricted baiting activity to "approximately 5 percent of the Refuge." FWL67. The Service also clarified its authority to delay the start of the refuge baiting season "later than the State authorized season (i.e. May 1 vs. April 15) . . . . primarily out of concern for brown bears which may be more available in early spring and become attracted to bait causing potential conflict or even harm to the hunter or bear." *Id.* Finally, the Service noted that it may revisit its decision "to determine if additional changes are warranted, in particular to any developing human safety concerns or noticeable impacts to the area's brown bear population." FWL72.

## V. After the Alaska Board of Game Upset Longstanding Hunting and Trapping Restrictions, the Service Passed the Kenai Rule to Maintain the Status Quo.

In 2013, the Board passed two hunting regulations that upset longstanding restrictions on hunting and trapping in the Kenai Refuge. First, the Board "opened the

Skilak WRA to taking of lynx, coyote, and wolf within the area under State hunting regulations," with the first takes on the Skilak WRA to be allowed beginning November 10, 2013. FWL13570. Second, the Board adopted "a regulation allowing the take of brown bears at registered black bear baiting stations on the Kenai Peninsula." FWL13568. The Board adopted both of those regulations despite warnings that the Service would take federal action to maintain the status quo ante. FWL13568, 13570.

**Skilak WRA Closure:** The Board's Skilak WRA regulation never had any effect because the "Service enacted a permanent closure restricting hunting and closing trapping in the Skilak WRA" on November 4, 2013, before the hunting season opened. FWL13570. That closure "mimicked State of Alaska hunting and trapping regulations for the area in effect prior to 2013." *Id.* The Service noted that it was adopting the closure for several reasons: to maintain "longstanding restrictions on hunting" in the Skilak WRA that were co-developed with State agencies; to prevent "degrade[d] opportunities for wildlife observation, photography, and environmental education and interpretation," expected to be associated with annual harvests of furbearers; to minimize "conflicts between non-consumptive and consumptive users of the Skilak WRA" given "increased public use during winter"; and to ensure that the Kenai Refuge satisfied its "unique purposes" of "environmental education" and non-consumptive "'wildlife-oriented' recreational uses." FWL13570–71.

**Brown Bear Baiting:** Although the Board's brown bear baiting regulations also did not go into effect on the Kenai Refuge, similar regulations went into effect elsewhere on the Kenai Peninsula with significant negative effects on brown bear populations.

FWL13568. Brown bear baiting was first allowed in the Spring of 2014, resulting in

significant increases in brown bear takes. *See id.* In Game Management Unit (GMU) 7,

whereas only 12 brown bears were taken in 2013 before baiting was allowed, that

increased to 38 bears in 2014 (with 77 percent being taken over bait). *Id.* When coupled

with other liberalizations of brown bear hunting regulations by the Board, the human-

caused mortality rate of brown bears on the Kenai Peninsula (GMUs 7 & 15) nearly

tripled over a three-year period. *Id.* Relying on best available scientific data and

population modeling, the Service determined that the Board's liberalized hunting

practices "resulted in a decline of approximately 18 percent" from 582 brown bears on

the Kenai Peninsula to 478 brown bears over just a three-year period. *Id.* The Service

found that this "rapid reduction" in population conflicted with its legal mandates on the

Kenai Refuge:

> The Service deemed this rapid reduction of the Kenai
> Peninsula brown bear population, along with the potential for
> continued decline, to be inconsistent with meeting its legal
> mandates to conserve healthy wildlife populations (including
> brown bears) in their natural diversity on the Refuge, to
> provide for wildlife-oriented recreational opportunities that
> include both consumptive and non-consumptive activities, and
> to meet the Refuge's Wilderness purposes; therefore, the
> Service implemented closures to brown bear sport hunting on
> the Refuge in 2013 and 2014.

*Id.*

The Service concluded that these liberalized hunting practices, in particular brown

bear baiting, raised conservation concerns. Unlike black bears, brown bears "have one of

the lowest reproductive potentials of any North American mammal" and comprise a

"relatively small population" on the Kenai Peninsula. FWL13569. And "immigration

from mainland Alaska will not assist in sustaining the population" because "[g]enetic studies have determined that Kenai brown bears comprise an insular population." *Id.* In 1998, the State of Alaska designated the Kenai brown bear population as a "population of special concern" based on concerns about, *inter alia*, increasing levels of human-caused mortality. FWL13568. The Service's analysis "suggested that similar levels of human-caused mortality of brown bears documented from 2012-2014 (primarily resulting from sport hunting) would continue to reduce the brown bear population to levels similar to those which in the recent past posed conservation concerns." *Id.* "Based on best available scientific information and population modeling using the Vortex 9.9 model, the Service believes that allowance of take of brown bears over bait on the Refuge would increase human-caused mortality of Kenai brown bears to levels which would continue to reduce the population, with potential to result in conservation concerns for this population." FWL13569.

The Service noted a few additional factors that supported its "decision to maintain existing regulations that restrict harvest over bait to take of black bears only." *Id.* First, timely and accurate monitoring of Kenai brown bear populations is "extremely difficult at best" and costly (without a guaranteed funding source), counseling in favor of a "cautious approach" to managing brown bear populations. *Id.* Second, the Service noted that brown bear baiting would be expected to result in "increased baiting activity"—with approximately 100 additional baiting stations—and thus "increased potential for human-bear conflicts." *Id.* Consistent with its 2007 Compatibility Determination on black bear baiting, the Service merely noted that baiting "has potential to create food-conditioned

bears," without determining whether there was evidence that baiting resulted in food-conditioned bears.  *Id.*

**Firearm Discharge Restrictions:** The only other challenged aspect of the Kenai Rule is its restriction on firearm discharges along the shorelines of the Kenai River and Russian River within the Kenai Refuge:

> You may not discharge a firearm within ¼ mile of the west shoreline of the Russian River from the upstream extent of the Russian River Falls downstream to its confluence with the Kenai River, and from the shorelines of the Kenai River from the east refuge boundary downstream to Skilak Lake and from the outlet of Skilak Lake downstream to the refuge boundary, except that firearms may be used in these areas to dispatch animals while lawfully trapping and shotguns may be used for waterfowl and small game hunting along the Kenai River. These firearms discharge regulations do not preclude use of firearms for taking game in defense of life and property as defined under State law.

50 C.F.R. § 36.39(i)(5)(i) (2019).  The Service added that restriction "specifically to enhance public safety along these intensively used river corridors."  FWL13566.  The Service noted a concerning overlap of usage, involving fishing, river recreation, and brown bear hunting—which resulted in bears being "shot in close proximity to other users fishing from shore, wading, or boating," using "firearms and ammunition with substantial lethal distances . . . in areas where sight distances are extremely limited due to vegetation and river meanders."  *Id.*  Because the State had recently expanded the brown bear hunting season from October 15–30 to September 1–May 31, the expanded season overlapped with increased usage of these rivers for recreation and fishing in the spring and fall.  *Id.*  The Service thus restricted dangerous firearm discharges within a quarter mile of river shoreline.  *Id.*

*State of Alaska v. Bernhardt,* Case No. 3:17cv13 (SLG)
FWS Kenai Rule                                                                          15
Case 3:17-cv-00013-SLG   Document 179   Filed 03/09/20   Page 23 of 56

In responding to concerns that this restriction would affect "a traditional moose and bear hunting area," the Service noted that the impacts would be "negligible," as it was restricting discharges on 0.2 percent—fewer than 4,000 of 1.9 million acres—of the lands in the Refuge currently open to hunting moose and bear. *Id.* In other words, "most hunting activity for these species occurs outside of these river corridors." *Id.*

## LEGAL STANDARDS

Agency decisions are reviewed under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In accordance with that standard, an agency's decision will be overturned,

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and internal quotation marks omitted). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted). "The APA does not allow the court to overturn an agency

decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (citation omitted).

**ARGUMENT**

I.      **Kenai Plaintiffs Cannot Challenge the Restrictions on Dog-Assisted Big Game Hunting, Which Have Been in Place for Over Three Decades**.

Although the Kenai Plaintiffs seek to challenge a restriction on dog-assisted hunting on the Kenai Refuge, their challenge is barred by the statute of limitations, the scope of the pleadings, and standing requirements.  It also fails on the merits.

As an initial matter, the Kenai Plaintiffs make two errors in claiming that the "Kenai Rule also prohibited hunting with dogs, except for hunting black bear under a special use permit."  Pls.' Mem. in Supp. of Mot. for Summ. J. (Mot.) 26, ECF No. 171. *First*, the Service does not prohibit all hunting with dogs; instead, it restricts "hunting *big game* with the aid or use of dog."  50 C.F.R. § 36.39(i)(5)(iii) (emphasis added).  *Second*, that restriction was not added in the Kenai Rule; it was added three decades earlier. *See* 51 Fed. Reg. at 32,333.

Because that restriction is over three decades old, the Kenai Plaintiffs' challenges to the restriction are barred by the statute of limitations, 28 U.S.C. § 2401(a).  *See Wind River Min. Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991) ("If a person wishes to challenge a mere procedural violation in the adoption of a regulation or other agency action, the challenge must be brought within six years of the decision."); *accord Perez-Guzman v. Lynch*, 835 F.3d 1066, 1077 (9th Cir. 2016), cert. denied, ––– U.S. ––––, 138 S. Ct. 737 (2018) ("Procedural challenges to agency rules under the Administrative

Procedure Act are subject to the general six-year limitations period in the U.S. Code.").[3] Thus, any claims that the Service provided insufficient justification for restricting dog-assisted big game hunting should have been brought by 1992, i.e., six years after the restriction was promulgated.

Challenges to the dog-assisted hunting provision are also barred as exceeding the scope of the pleadings. *See Finnegan v. Citi*, 703 F. App'x 625, 626 (9th Cir. 2017) (citing *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 198-99 (9th Cir. 1995)) ("legal theories not asserted in the plaintiff's complaint are waived"). The State of Alaska's Amended Complaint does not mention Service restrictions on dog-assisted hunting. *See* ECF No. 60. While the Safari Club's Amended Complaint makes a passing mention of the Service's restrictions on dog-assisted hunting, ECF No. 59 ¶ 93, it never indicates that it is challenging those longstanding restrictions, *id.* ¶¶ 139–172.

These challenges are also barred on standing grounds because the State of Alaska similarly restricts dog-assisted hunting. Like Service regulations on the Kenai Refuge, current State "regulations prohibit hunting big game with dogs except that the Department may issue a permit to allow the use of dogs to hunt black bear under

---

[3] Although "a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency's application of that decision to the specific challenger," *Wind River*, 946 F.2d at 716, the Kenai Plaintiffs are not such challengers because the dog-assisted hunting restriction has not been applied to them. *See id.* at 715 ("Such challenges, by their nature, will often require a more 'interested' person than generally will be found in the public at large.").

prescribed conditions."  Alaska's Am. Compl. ¶ 92; 5 AAC 92.085(5).[4]  Thus, any injury

from the Service's restriction on dog-assisted hunting would not be redressed by a

decision striking down that restriction, as such activities would still be restricted by state

regulations.  *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (standing

requires it to be "likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision" (citation and internal quotation marks omitted)).

Additionally, Plaintiffs have failed to show an injury traceable to the Service's

restriction on dog-assisted hunting.  The sole injury claimed is an inability to "hunt with

my dogs for coyotes."  Reese Decl. ¶ 14, ECF No. 171-3; *see also* Mot. 50.  But Mr.

Reese's inability to engage in dog-assisted coyote hunting is traceable to state

regulations, which prohibit taking fur animals, such as coyotes, on the Kenai Refuge with

a dog.  5 AAC 92.090.[5]  Thus, the Kenai Plaintiffs have failed to carry their burden of

showing how that injury is traceable to the Service.

While these fundamental defects prevent the Court from reaching the merits of the

dog-assisted hunting restriction, the Kenai Plaintiffs have also failed to show that the

restriction is arbitrary or capricious.  Their sole argument why this prohibition is unlawful

is that the Kenai Rule did not "attempt to justify or offer data to support" this decades-old

_____

[4] Alaska also publishes a brochure telling hunters that they may not "[h]unt big game
with the aid or use of a dog" except "to hunt black bears under a permit."  2019–2020
Alaska Hunting Regulations, at 19, available at
http://www.adfg.alaska.gov/static/applications/web/nocache/regulations/wildliferegulatio
ns/pdfs/regulations_complete.pdf771BD3313394F57A6B1F82A8D390AE4C/regulations
_complete.pdf.

[5] "Fur animals **MAY NOT** be taken . . . with a dog (except coyote in Unit 20D)."  2019–
2020 Alaska Hunting Regulations, at 140, *supra* note 4.

*State of Alaska v. Bernhardt,* Case No. 3:17cv13 (SLG)
FWS Kenai Rule                                                                                                    19
Case 3:17-cv-00013-SLG   Document 179   Filed 03/09/20   Page 27 of 56

restriction.  Mot. 26.  Of course, the Kenai Rule did not need to justify pre-existing regulatory requirements; those requirements were justified based on the record made back in the 1980s.  As the 1985 CCP explains, "[d]iseases and parasites can be transmitted from domestic animals to wildlife and vice versa" and "predation by domestic or feral animals (such as dogs) on wild animals" is a concern.  FWL14261.  Had the Safari Club disagreed with the restrictions on dog-assisted big game hunting, it should have commented on the proposed rule when it was published in 1986, thereby offering the Service a chance to address its concerns.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978) ("administrative proceedings should not be a game or a forum to engage in unjustified obstructionism" by failing "to bring [a] matter to the agency's attention, [then] seeking to have that agency determination vacated on the ground that the agency failed to consider [the] matter[]").

## II.    The Service's Skilak WRA Restrictions Should Be Upheld.

The Kenai Plaintiffs also seek to upset a long-settled management approach for the Skilak WRA, a tiny portion of the Kenai Refuge focused on non-consumptive uses.  They make three unavailing arguments: that the Service lacked evidence to support its view that hunting in the Skilak WRA would reduce opportunities for non-consumptive uses, Mot. 14–17; that limitations on hunting can only be justified by conservation concerns, Mot. 15, 37–41; and that hunting should be accommodated throughout the whole refuge as a priority use under the Improvement Act, Mot. 15, 41–48.  As explained below, each of these arguments lacks merit.

A.    <u>The record supports the Service's determination that increased hunting in the Skilak WRA would reduce opportunities for non-consumptive use</u>.

As discussed above, the Service and the State cooperatively planned the Skilak WRA as a small portion of the Kenai Refuge that is focused on non-consumptive uses, such as environmental education and wildlife viewing. *See supra* pp.5–7. While limited hunting activities (e.g., a short-duration, youth-only small-game hunt) have been permitted on the Skilak WRA, most hunting and trapping activities can occur only in the remaining 97% of the Refuge. Thus, the Board's efforts to expand the hunting and trapping opportunities available in the Skilak WRA implicated the Secretary's directives under the Improvement Act.

Under the Improvement Act, the Secretary of the Interior "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use and that the use is not inconsistent with public safety." 16 U.S.C. § 668dd(d)(3)(A)(i). A "compatible use" is a "wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." *Id.* § 668ee(1). And the Director's "sound professional judgment" "means a finding, determination, or decision that is consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of this Act and other applicable laws." *Id.* § 668ee(3).

As directed, the Service used "principles of sound fish and wildlife management and administration" and "available science and resources" to determine whether

expanded hunting would detract from opportunities for non-consumptive uses on which the Skilak WRA had long been focused. The Service found that while there were no "area-specific studies and data, it is a reasonable conclusion that annual harvest would maintain reduced densities, and/or affect behavior, of these species in the Skilak WRA and degrade opportunities for wildlife observation, photography, and environmental education and interpretation, given the area's small size, its accessibility by road, proximity to population centers, and likely hunting (or trapping) pressure." FWL13570. Because that analysis provides a "reasonable basis" for the Service's determination that expanded hunting would detract from opportunities for non-consumptive uses, that determination should be upheld under the "highly deferential" standard of review. *Nw. Ecosystem All.*, 475 F.3d at 1140.

The Kenai Plaintiffs have failed to show that this determination is arbitrary or capricious. They identify no available science or data that the Service overlooked. Nor do they undermine the soundness of the Service's analysis that annual harvests will decrease densities or alter behavior of "wary wildlife species," like wolves, coyote and lynx. *See* FWL13570. Instead, the Kenai Plaintiffs quibble about whether the Service analyzed potential beneficial effects on prey species, alternative education options such as information kiosks, or some unidentified "narrowly-crafted hunting program."[6] Mot.

---

[6] The Service has allowed narrowly crafted hunting programs on the Skilak WRA, such as a nine-day, youth-only small-game hunt with appropriate firearms, FWL1054–57, or a limited-entry permitted moose hunt (when there is available moose capacity, which has happened only a few times over the last thirty years), FWL13570; FWL11971. But the Board's proposal would have opened the Skilak WRA to an annual, unlimited-entry hunt with a 6.5 month season. *See* FWL13570; FWL11971.

14–15.  But they provide no precedent requiring the Service to consider such

alternatives—let alone show where those alternatives were proposed in comments during

the rulemaking process.  Nor do they provide any precedent requiring the Service to

create studies or data that do not exist instead of relying on sound wildlife management

principles.

> **B.**     The Service can restrict hunting activities on the Kenai Refuge for reasons
> beyond conservation, such as public safety.

The Kenai Plaintiffs overreach in claiming that ANILCA prevents the Service

from regulating hunting or fishing on the Kenai Refuge unless "necessary for the

conservation of healthy populations of fish and wildlife."  Mot. 40 (quoting 16 U.S.C.

§ 3125(3)).  This argument ignores both the structure and text of ANILCA, as well as the

specific purposes of the Kenai Refuge.  Additionally, their argument makes little logical

sense, as it would prevent the Service from implementing basic public safety

requirements, such as restricting hunters from discharging firearms in crowded areas of

the Refuge.

ANILCA is a broad statute consisting of fourteen different titles, most of which

cover different subjects.  National Wildlife Refuges are governed by Title III, whereas

Subsistence Management and Use is governed by Title VIII.  The Kenai Plaintiffs

nonetheless rely on a limitations clause from Title VIII to cabin the Service's authority

under Title III.  As explained below, that limitations clause does not apply to the

Service's Title III authority, but even if it did, the Secretary would still have authority to

restrict hunting on the Kenai Refuge for purposes beyond conservation.

Title III of ANILCA governs the National Wildlife Refuge System in Alaska in several ways. Section 302 established new refuges, while section 303 expanded or redesignated then-existing refuges. Sections 302 and 303 also establish the purposes of each refuge. *See, e.g.*, *supra* pp.2–3 (quoting the purposes of the Kenai Refuge). And Section 304 governs the administration of refuges in Alaska, largely requiring them to be managed in accordance with their respective purposes. For example, the Secretary is generally obligated to permit the "exercise of valid commercial fishing rights or privileges" unless "he determines" the exercise of those rights "to be inconsistent with the purposes of a unit of the National Wildlife Refuge System as described in this section and to be a significant expansion of commercial fishing activities within such unit." ANILCA, § 304(d).

In Title III, Congress set forth a list of purposes for which the Kenai Refuge "is established and shall be managed." *Id.* § 303(4)(B). The first two purposes are the conservation of fish and wildlife and fulfilling international treaty obligations. *Id.* § 303(4)(B)(i)–(ii). In a manner "consistent" with those two purposes, the Kenai Refuge is also to be managed to protect water and to provide opportunities for scientific research and environmental education. *Id.* § 303(4)(B)(iii)–(iv). Finally, "in a manner compatible with these purposes" the Kenai Refuge should be managed to provide opportunities for fish and wildlife-oriented recreation, such as wildlife viewing or hunting. *Id.* § 303(4)(B)(v). Thus, the Service must manage the Kenai Refuge to provide opportunities for wildlife viewing or hunting to the extent "compatible" with the other refuge purposes, such as environmental education or conservation.

Congress not only anticipated that refuge purposes may be incompatible but also provided an administration approach for resolving those conflicts. Section 304(g) of ANILCA directs the Secretary to prepare a plan—i.e., CCP—for each refuge that "designate[s] areas within the refuge according to their respective resources and values" and "specif[ies] the uses within each such area which may be compatible with the major purposes of the refuge." That plan must further "set forth those opportunities which will be provided within the refuge for fish and wildlife-oriented recreation, ecological research, environmental education and interpretation of refuge resources and values, if such recreation, research, education, and interpretation is compatible with the purposes of the refuge." ANILCA § 304(g)(3)(A)–(B). Thus, Title III of ANILCA authorizes the Secretary to accommodate incompatible refuge purposes by specifying different areas of a refuge for different purposes.

Despite the straightforward approach for managing refuges set forth in Title III, the Kenai Plaintiffs claim that the Service cannot restrict hunting anywhere on the refuge unless it is "necessary for the conservation of healthy populations of fish and wildlife." Mot. 40 (quoting ANILCA § 815(3)). But the plain text of that restriction demonstrates that it does not apply to Title III:

> **Sec. 815. Limitations, Savings Clauses**
>
> Nothing in this title shall be construed as—,
>
> . . .
>
> (3) authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands (other than national parks and park monuments) unless necessary for the conservation of healthy populations of fish and wildlife, for the

reasons set forth in section 816, to continue subsistence uses of
such populations, or pursuant to other applicable law;

Because that limitations clause governs the construction of "this title," i.e., Title VIII, it

does not apply to Title III.[7]

Assuming *arguendo* that provisions specific to Title VIII could govern Title III,

the Kenai Plaintiffs' argument would still fail under for section 816 of ANILCA.  In a

Title VIII-specific clause, section 816 confirms "the authority of the Secretary to

designate areas where, and establish periods when, no taking of fish and wildlife shall be

permitted on the public lands for" either "reasons of public safety" or "administration":

### Sec. 816. Closure to Subsistence Uses

. . .

(b) Except as specifically provided otherwise by this section,
nothing in this title is intended to enlarge or diminish the
authority of the Secretary to designate areas where, and
establish periods when, no taking of fish and wildlife shall be
permitted on the public lands for reasons of public safety,
administration, or to assure the continued viability of a
particular fish or wildlife population.

. . .

And that confirmation of the Secretary's authority would supersede any restriction in

Section 815, which permits constructions authorizing "restriction on the taking of fish

---

[7] Not only is that limitations clause confined to governing the construction of Title VIII,
but it also permits hunting restrictions for more reasons than the Kenai Plaintiffs claim.
In addition to conservation, hunting restrictions may be allowed "for the reasons set forth
in section 816, to continue subsistence uses of such populations, or pursuant to other
applicable law."  ANILCA § 815(3).  The catchall provision—"pursuant to other
applicable law"— alone suffices to defeat their argument that federal hunting restrictions
are authorized only for conservation reasons.

*State of Alaska v. Bernhardt,* Case No. 3:17cv13 (SLG)
FWS Kenai Rule                                                                                      26

and wildlife for nonsubsistence uses on the public lands" when necessary "for the reasons set forth in section 816."

In sum, the limitations clause in Title VIII of ANILCA does not limit the Secretary's authority to restrict takings on refuges when those takings conflict with refuge purposes. Because the Service reasonably determined that opening hunting in the Skilak WRA would conflict with the refuge purpose of environmental education,[8] ANILCA provides no basis for overturning the Skilak WRA restrictions in the Kenai Rule. *See* 16 U.S.C. § 3202(c) ("The taking of fish and wildlife in all conservation system units [including National Wildlife Refuges] shall be carried out in accordance with the provisions of [ANILCA] and other applicable State and Federal law.").

C.    The Improvement Act does not require the Service to allow unrestricted hunting throughout the entirety of the Kenai Refuge.

The Kenai Plaintiffs next contend that the Service violated the Improvement Act by "elevat[ing] one compatible priority use (viewing) over another (hunting)," Mot. 42, and "promoting non-priority uses over hunting," Mot. 44. Neither argument has merit, as the Kenai Plaintiffs would effectively require hunting to be unrestricted throughout the entire Kenai Refuge.

As an initial matter, the Service did not elevate one priority use over another. Instead, as authorized by section 304(g) of ANILCA, the Service specified different areas

_____

[8] The Service found that "Refuge environmental education and interpretation programs that benefit from enhanced opportunities provided in the area to view or otherwise experience these species would be negatively impacted" by opening hunting in the Skilak WRA. FWL13570.

of the refuge for different purposes that can be incompatible.  That longstanding practice was developed after cooperative discussions with the State about the special value of the Skilak WRA for environmental education and wildlife viewing.  And that cooperative approach drove the Service's investment decisions for decades, as it directed funds toward improving facilities in the Skilak WRA for environmental education and wildlife viewing.

The Kenai Plaintiffs claim that the Service must discard that longstanding practice because it was initially developed before the Improvement Act established hunting as a priority use of refuge lands.  Mot. 43.  But the Kenai Plaintiffs overlook that any conflict between the Improvement Act and ANILCA is resolved in favor of ANILCA.  *See* Improvement Act § 9(b).  Under section 303(4)(B) of ANILCA, environmental education and interpretation have priority over hunting.

Further, the Kenai Plaintiffs fail to realize that their approach to construing the Improvement Act would backfire on hunters.  Were their argument meritorious, it would call into question regulations giving hunting or fishing priority over wildlife viewing in other areas of the Refuge.  For example, one aspect of the Kenai Rule that Plaintiffs do not challenge authorizes the "Refuge Manager" to "issue a special use permit" authorizing airplane operations on a lake within the Refuge "to successful applicants for certain State of Alaska, limited-entry, drawing permit hunts."  50 C.F.R. § 36.39(d)(i)(1)(i)(B)(17).  A commenter objected to this provision, arguing that "[i]t would set a poor precedent to allow access only for the purpose of killing wildlife at a Wilderness lake and at the same time not allow a visitor take photos of wildlife."

FWL9164. Despite this objection, the Service limited aircraft operations on this lake to hunters. 81 Fed. Reg. at 27,031–32. Similarly, aircraft operations on three other lakes are authorized "only to provide access for ice fishing." 50 C.F.R. § 36.39(d)(i)(1)(i)(A)(17). If the Improvement Act did not permit one priority use (hunting or fishing) to be elevated over another priority use (wildlife viewing)—as the Kenai Plaintiffs claim—then it is difficult to see how these regulations would survive the Improvement Act.[9]

The Kenai Plaintiffs are also incorrect in claiming that the Service has elevated non-priority uses, such as hiking and night sky observation, over hunting in violation of the Improvement Act. *See* Mot. 44. To the contrary, the Service merely mentioned those activities in order to demonstrate that the Skilak WRA was used in the fall and winter as well as the summer. FWL13570. But the Service did not prioritize those uses over hunting. Rather, as directed by section 6 of the Improvement Act, the Service considered whether a "new use" of the Kenai Refuge (open hunting in the Skilak WRA) was "inconsistent with public safety." *See* 16 U.S.C. § 668dd(d)(3)(A)(i). Because there was "substantial" use of the Skilak WRA in fall and winter months—for a variety of activities including "general nature observation and photography"—the Service concluded that

---

[9] It is also difficult to see how the practice of hunting black bears over bait could continue, as the Service does not allow wildlife photographers to bait black bears to obtain a photo. *See supra* pp.10–11.

allowing hunting or trapping in the Skilak WRA during winter would increase the potential for "safety issues." FWL13570.[10]

### III.    The Service's Firearm Discharge Restrictions Should Be Upheld.

The Kenai Plaintiffs next challenge the Kenai Rule provision that restricts certain firearm discharges along heavily used river corridors. Mot. 17–21, 44. As explained above, the Service adopted those restrictions for public safety reasons, given recent discharges of firearms in crowded areas with low visibility. *See supra* pp.15–16. While the Kenai Plaintiffs quibble with the Service's analysis, they provide no reason to overturn this important public safety regulation.

*First*, the Kenai Plaintiffs incorrectly claim that the Service's restrictions are intended to restrict big game hunting, rather than to further legitimate public safety concerns, because other forms of firearm discharge are still permitted. Mot. 17–20. Not so. The Kenai Rule clearly explains the basis for the Service's public safety concern: recent firearm discharges in 2013 and 2014 had created safety concerns due to their close proximity to other users, such as fishers or boaters. FWL13566. Those discharges

---

[10] While the Service also analyzed the need to "[m]inimize conflicts between non-consumptive and consumptive users of the Skilak WRA," the non-consumptive uses it identified are generally priority uses under ANILCA. *See* FWL13570. For example, contrary to the Kenai Plaintiffs claim that "hiking" is not a priority use of the refuge, the Skilak WRA Management Plan describes "a number of environmental education programs throughout the Skilak WRA including 'The Role of Fire in Alaska' where students hike the Hidden Creek Trail to explore a re-vegetating burn site, and 'Leave No Trace' where students learn the seven (7) Leave No Trace principles through hands-on activities on the Seven Lakes Trail." FWL1014. That management plan also explains that "[m]ost visitors participate in several activities while using the area," such as a combination of "cross-country skiing" and "wildlife viewing." FWL1007.

involved "firearms and ammunition with *substantial lethal distances* . . . in areas where sight distances are extremely limited due to vegetation and river meanders." *Id.* (emphasis added). In contrast, discharging shotguns to take waterfowl generally does not involve substantial lethal distances to humans. *Cf.* FWL1057 (authorizing a youth-only hunt involving "shotguns using size 4 birdshot or smaller"). And discharging firearms to dispatch trapped animals generally does not involve aiming at moving targets, thereby decreasing public safety concerns. Given the less dangerous nature of these exceptions, the Service's restriction of other firearm discharges was at least rationally connected to its public safety objective.

*Second*, the Kenai Plaintiffs quibble with the nature of the study relied on by the Service regarding river usage. Mot. 19–20. Despite their concerns about the methodology of that study, they present no alternate study or contrary data that the Service should have considered regarding river usage. In any event, the Service relied on the study as evidence that river usage had become more crowded at times that overlapped with expanded hunting seasons. None of the Kenai Plaintiffs' criticisms show that it was unreasonable for the Service to rely on the study for that purpose.

*Third*, the Kenai Plaintiffs incorrectly claim that the Service never considered the loss of a "traditional moose and bear hunting area." Mot. 21. The Service plainly considered that concern. FWL13566 (response to comment 8). The Service determined that the "rule will have negligible impacts on overall hunting opportunity and harvest levels of black bears, brown bears, and moose on the Refuge, as most hunting activity for these species occurs outside of these river corridors," and the discharge restriction affects

"approximately 0.2 percent of lands in the Refuge currently open to hunting of moose, black bear, and brown bear." *Id.*

*Fourth*, the Kenai Plaintiffs assert that the Service promoted non-priority uses such as river floating and hiking over hunting, thereby violating the Improvement Act. Mot. 44. To the contrary, the Service observed that fishing—a priority use under the Improvement Act—was the primary reason for increased river usage. FWL13566 ("Field observations by Refuge staff and interactions with users and permitted fishing guides and outfitters have documented steadily increasing levels of public use, primarily for fishing but also for river floating (Kenai River only), and associated activities such as hiking and wildlife viewing . . . ."). While the Service also considered general river recreation to document levels of river usage, its public safety concerns are justified under ANILCA and the Improvement Act.

## IV. The Service's Brown Bear Baiting Restriction Should Be Upheld.

The Kenai Plaintiffs next challenge the longstanding practice of restricting brown bear baiting on the Kenai Refuge for several unavailing reasons.

*First*, the Kenai Plaintiffs incorrectly claim that the Service justified "the prohibition on hunting brown bear over bait based on alleged ethical concerns" and did "not even attempt to justify the prohibition[] as being for conservation purposes." Mot. 40. Here, the Kenai Plaintiffs simply ignore the substantial data in the Kenai Rule about how hunting Kenai brown bears over bait increased human-caused mortality rates to the point of raising conservation concerns. *See supra* pp.12–15. Further, they ignore the stated motivation for the Kenai Rule—"the Service believes that allowance of take of

brown bears over bait on the Refuge would increase human-caused mortality of Kenai brown bears to levels which would continue to reduce the population, with potential to result in conservation concerns for this population," FWL13569—and ascribe alternate motives to the Service based on unreviewable correspondence between the Service and the State about Board regulations.

Assuming *arguendo* that ethical concerns motivated the brown bear baiting restrictions, those restrictions should still be upheld because "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). Nor may a court "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities" because agency policymaking is "routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Id.* Thus, regardless whether ethical concerns motivated the Service, the Kenai Rule's stated conservation motivation is alone sufficient to uphold the rule.

*Second*, the Kenai Plaintiffs claim that the Service changed its position on hunting bears over bait without a reasoned explanation. Mot. 22–24. Not so. As an initial matter, their criticism ignores the primary conservation basis for the brown bear baiting restriction and instead goes to a secondary public safety basis about food-conditioned bears. *See* FWL13568–69. Even as to that secondary basis, the Service has not changed its position regarding whether baiting bears causes them to be food-conditioned. In both

the 2007 Compatibility Determination on black bear baiting and the Kenai Rule, the Service noted the *potential*—without conclusive evidence—for baiting to condition bears to human food. *See* FWL70 (describing concern about how baiting makes bears "more likely to become a nuisance or problem bear" as an issue that "deserves additional attention," like "the potential concern for human and non-target bear safety around the bait station"); FWL13569 ("baiting for black bears is currently allowed on the Refuge and has potential to create food-conditioned bears").[11] While the Service reached a different conclusion about how that potential concern should affect baiting practices, it explained why it reached a different conclusion. It expected "increased baiting activity and increased potential for human-bear conflicts if take of brown bears over bait were allowed," as the number of baiting stations on the Kenai Peninsula had increased by approximately a third—with more than 100 new stations—since the Board authorized hunting brown bears over bait. FWL13569. Accordingly, the Service provided a reasonable explanation for any change in its position regarding how bear baiting affects public safety.

---

[11] To the extent the Kenai Plaintiffs assert that the Service reached a different conclusion about the evidence on whether baiting leads to food-conditioned bears, the record contains ample support for an alternate conclusion. *See, e.g.*, Stephen Herrero, Bear Attacks 71–72 (1985), FWL28–29 (describing a killer bear that "had learned over many years that people and garbage, or trap sites, yielded food" and "became so familiar with trap sets that it could get bait without always being caught"). Although the Kenai Plaintiffs criticize Herrero because it pre-dates the Service's 2007 Compatibility Determination, they provide no evidence that Herrero was considered by the Service in making that Compatibility Determination.

*Third*, the Kenai Rule does not "attempt[] to 'bypass' an unexplained change in position," as Kenai Plaintiffs claim. *See* Mot. 24–26. The Kenai Plaintiffs' sole evidence of this supposed "bypass" is an internal agency email about a different subject: "predator control" and "BOGTestimony." *See* FWL1984–85. That email was written in February 2013, two years before a proposed version of the Kenai Rule was even published. And as discussed below, the Kenai Rule does not rely on notions of "predator control" or predator management. *See infra* pp.36–37. In any event, this internal email is not evidence of an unexplained change in agency position. *Cf. Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 717–18 (10th Cir. 2010) ("agency employees need not be afraid to conduct debates over e-mail because the agency will not" usually be bound by such communications). Nor does a preliminary opinion that "is later overruled at a higher level within the agency . . . render the decisionmaking process arbitrary and capricious." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007) ("With regard to the various statements made by the involved agencies' regional offices during the early stages of consideration, the only 'inconsistency' respondents can point to is the fact that the agencies changed their minds—something that, as long as the proper procedures were followed, they were fully entitled to do."); *see also Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 868 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 309 (2018), and 139 S. Ct. 57 (2018) ("[A] diversity of opinion by local or lower-level agency representatives will not preclude the agency from reaching a contrary decision, so long as the decision is not arbitrary and capricious and is otherwise supported by the record.") (citation and internal quotations omitted).

*Fourth*, the Kenai Plaintiffs claim that the Kenai Rule "conflicts with an Interior regulation" at 50 C.F.R. § 32.2(h), Mot. 21–22, which parenthetically states that "(Baiting is authorized in accordance with State regulations on national wildlife refuges in Alaska)." Mot. 21–22. Yet that parenthetical merely served to clarify that the "General Provision[]" prohibiting "hunting over bait . . . on wildlife refuge areas" did not apply to refuges in Alaska, which were "opened to hunting, fishing and trapping" under ANILCA and governed by "specific refuge regulations." 58 Fed. Reg. 5065, 5069 (Jan. 19, 1993). While the Service may have acceded to State bait regulations in place in 1993, it plainly did not accede to the subsequent State regulations regarding hunting brown bears over bait on the Kenai Refuge.

## V. The Court Need Not Reach the Meaning of "Natural Diversity" Under ANILCA.

In five pages near the end of their brief, the Kenai Plaintiffs raise questions about whether "predator control" or "intensive management" are consistent with ANILCA's requirement that the Secretary "conserve fish and wildlife populations and habitats in their natural diversity," citing various floor speeches about the meaning of that phrase. Mot. 44–48 (quoting ANILCA § 303).

The Court need not reach those questions, however, because the Kenai Rule does not rely on any discussion of "intensive management" or "predator control." Plaintiffs recognize this omission and instead point to a letter the Service sent to the State discussing those concepts in relation to regulations adopted by the Board. Mot. 44, 46

(citing FWL2113).[12]  But that letter is not an agency action reviewable under the APA.

*See* 5 U.S.C. §§ 551(13), 702.  Because that letter is unreviewable, the Court need not

opine on the propriety of the Service's characterizations of Board regulations, especially

when those characterizations were not the basis for the Kenai Rule.  *See* Order re Mot. to

Supplement, at 4, ECF No. 129 ("the reasons why the Board of Game took the actions it

took is not before this Court on review").

Moreover, the relevant issue before the Court is whether the Service's restrictions

on brown bear baiting were in furtherance of its mandate to "conserve fish and wildlife

populations and habitats in their natural diversity" in the Kenai Refuge.  That turns

principally on the data about brown bear populations and human-caused mortality in the

Kenai Rule, not whether the Board's regulations are properly characterized as intensive

management or predator control.  The Service's determination that the effect of baiting

on the Kenai brown bear population raises conservation concerns is entitled to deference.

*See Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1191–92 (9th Cir.

2000).

---

[12] That letter was "written to ensure continued open communications and coordination
between" the Service and the Alaska Department of Fish and Game.  FWL2113.

*State of Alaska v. Bernhardt,* Case No. 3:17cv13 (SLG)
FWS Kenai Rule                                                                                           37
Case 3:17-cv-00013-SLG   Document 179   Filed 03/09/20   Page 45 of 56

## VI. The Service Appropriately Analyzed Environmental Considerations Under NEPA.

### A. NEPA encourages the use of categorical exclusions so that agencies can focus their resources on assessing the environmental impacts of significant actions.

Congress enacted the National Environmental Policy Act (NEPA) to establish a consistent process for federal agencies to consider the consequences of their actions upon the environment. *See* 42 U.S.C. §§ 4321–4370m-12. NEPA also established the Council on Environmental Quality (CEQ). *Id.* § 4342. In 1978, CEQ promulgated regulations governing federal agency compliance with NEPA. *See* 40 C.F.R. §§ 1500.1–1517.7; 43 Fed. Reg. 55,978 (Nov. 29, 1978). CEQ created "three typical classes" of actions that require different levels of analysis to satisfy NEPA:

> (i) Which normally do require environmental impact statements.
>
> (ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).
>
> (iii) Which normally require environmental assessments but not necessarily environmental impact statements.

40 C.F.R. § 1507.3(b)(2).

At the most detailed end of the spectrum of analyses, NEPA requires federal agencies to prepare a detailed "environmental impact statement" (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). An EIS must include a "detailed written statement" concerning "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided"; it should inform the decision makers and the public of the

reasonable alternatives that would minimize the adverse impacts or enhance the quality of the environment. *Id.*; *see also* 40 C.F.R. §§ 1502.1, 1508.11.

If the potential significance of a federal action is unclear, a federal agency may prepare an environmental assessment (EA). These preliminary examinations of proposed actions allow an agency to determine whether NEPA requires it to prepare an EIS. 40 C.F.R. §§ 1501.4, 1508.9. The EA "serves to . . . [b]riefly provide sufficient evidence and analysis" to determine whether the action will have a "significant" effect on the environment, the threshold for preparation of an EIS. *Id.* § 1508.9. If the agency determines that the effects will not be significant, it issues a "finding of no significant impact" (FONSI). *Id.* § 1508.13.

CEQ's regulations also instruct agencies to identify classes of actions named "categorical exclusions," that normally "do not individually or cumulatively have a significant effect on the human environment" and are therefore excluded from the requirement of preparing an EA or an EIS. *Id.* §§ 1507.3(b)(2), 1508.4. An agency's procedures for categorical exclusions should "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," which would then require the agency to prepare an EA or EIS. *Id.* § 1508.4.

Categorical exclusions (CEs) are thus an integral part of NEPA. In 1983, CEQ explained that using CEs avoids unnecessary documentation of minor environmental effects in EAs and allows agencies to focus their environmental review efforts on the major actions that will have significant effects on the environment and which are the primary focus of NEPA. *See* Rules and Regulations, 48 Fed. Reg. 34,263, 34,263–66

(July 28, 1983); *see also* 40 C.F.R. § 1500.4(p) (noting that establishing and using CEs can reduce excessive paperwork by eliminating unnecessary preparation of EAs). The CEQ has encouraged agencies to identify CEs using "broadly defined criteria which characterize types of actions that, based on the agency's experience," normally do not have "significant environmental effects." 48 Fed. Reg. at 34,265.

        B.     <u>NEPA procedures do not apply to most challenged aspects of the Kenai Rule</u>.

Ninth Circuit law is clear that "NEPA procedures do not apply to federal actions that maintain the environmental status quo." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); *see also Sabine River Authority v. Interior*, 951 F.2d 669, 679–80 (5th Cir. 1992). Here, three of the four challenged actions simply maintain the environmental status quo on the Kenai Refuge that has been in place for three decades: dog-assisted big game hunting on the Kenai Refuge remains restricted to black bear hunts; hunting and trapping opportunities continue to be limited in the Skilak WRA; and hunting brown bears over bait continues to be banned.

The Kenai Plaintiffs argue that NEPA procedures are nonetheless required because the Kenai Rule "disallows conduct that would otherwise be legal under State regulations (e.g., limited hunting in the Skilak WRA, hunting brown bears over bait)." Mot. 31. Although State regulations may have attempted to authorize those practices, prompt federal responses prevented any change in the hunting status quo on the Kenai Refuge. The "Service enacted a permanent closure restricting hunting and closing trapping in the Skilak WRA" on November 4, 2013, before the initial Skilak WRA hunting and trapping

season opened on November 10, 2013.  FWL13570.  Before "harvest of brown bears at bait stations" became "legal for the first time in spring 2014," "the Service implemented closures to brown bear sport hunting on the Refuge" and, through its permitting process, prevented brown bear baiting on the Kenai Refuge.  FWL13568.  Thus, the State law changes did not alter the "environmental status quo" on the Kenai Refuge.

In sum, the only challenged aspect of the Kenai Rule that changed longstanding practices on the Kenai Refuge is the firearm discharge restriction along river corridors. As such, that restriction is the only challenged aspect of the Kenai Rule to which NEPA procedures conceivably apply.

C.    The Kenai Plaintiffs' NEPA arguments are waived.

The Kenai Plaintiffs have waived their NEPA arguments because they were not presented to the Service during comment on the Kenai Rule.  "Persons challenging an agency's compliance with NEPA must 'structure their participation so that it ... alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (quoting *Vt. Yankee*, 435 U.S. at 553 (alteration in *Public Citizen*)). "[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters" that had been obliquely referenced.  *Vt. Yankee*, 435 U.S. at 553–54.

Here, neither the Kenai Plaintiffs nor any other commenter said anything about categorical exclusions or extraordinary circumstances in their comments on the proposed Kenai Rule. The Safari Club's comments did not even mention NEPA. FWL8979–8983. And the State barely referenced NEPA while asking for more information about brown bear baiting restrictions, not firearm discharge restrictions:

> The Service is also neglecting its obligation to provide information required during the decision making process pursuant to 605 FW 1.8(D)(l), which states *"We will evaluate the impacts of the decisions using the NEPA process and give appropriate notification to the public."* Absent is any description of the current condition, possible effects of the state season, or the expected future condition of the proposed action. In accordance with Service policy, the proposed permanent closure to a state authorized hunting opportunity requires further analysis and justification specific to the prohibited use.

FWL8989. The final Kenai Rule responded to the State's comment, providing information about the current conditions of the Kenai brown bear population and the effects of the State's liberalized hunting policies for brown bears on that population. *See* FWL13568–69.

The Kenai Plaintiffs attempt to patch over the NEPA gaps in their comments by pointing to the Humane Society's comments, which contained several pages discussing NEPA. *See* Mot. 8 (citing FWL8947, FWL8953–54). But the Humane Society sought NEPA analysis for entirely different reasons than the Kenai Plaintiffs. It thought the State had "adopted a series of cruel and scientifically indefensible regulations that include allowing bear baiting and hounding and wholesale gray wolf persecution," FWL8947, and commended the Service for "taking a correct course of action to better protect wildlife," FWL8953. The Humane Society, however, was concerned that the Service's

"proposed changes do not go far enough" and sought a "supplemental EA/EIS" to "Consider Habitat Loss, Anthropogenic-caused Evolution, Global Warming and Lead Toxicity" from human actions, such as hunting. FWL8952–53. It never asked for further NEPA analysis of restrictions on hunting or firearm discharges. And it certainly never suggested that restrictions on hunting or firearm discharges required NEPA procedures beyond a CE, as the Kenai Plaintiffs now claim.

In sum, the Kenai Plaintiffs' NEPA arguments are new objections that were not presented in comments to the agency. "Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision." *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991). Had the Kenai Plaintiffs timely raised their NEPA concerns, the Service could have easily addressed their concerns in the Kenai Rule, as explained below.

D.    <u>The Service appropriately determined that the Kenai Rule was subject to categorical exclusions under NEPA.</u>

The Service's "interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999).

The Service correctly determined that the three challenged hunting restrictions that merely preserved the environmental status quo on the Kenai Refuge are subject to a CE

for maintaining the permitted level of use.[13]  *See* FWL13575.  That CE covers the

"issuance of special regulations for public use of Service-managed land, which maintain

essentially the permitted level of use and do not continue a level of use that has resulted

in adverse environmental impacts."  516 DM 8.5(C)(3).  The Kenai Plaintiffs have failed

to show that any of these hunting restrictions significantly alter the permitted level of use

on the Kenai Refuge or result in adverse impacts.

   The Service also correctly determined that the firearm discharge restriction had no

environmental effects that lend themselves to meaningful analysis.  *See* FWL13575.  The

Kenai Plaintiffs provide no reason why restricting firearm discharges on 0.2 percent of

refuge lands would have any meaningful environmental effect.  Accordingly, the Service

correctly determined that the firearm discharge restriction was subject to a CE for the

regulations "that are of an administrative, financial, legal, technical, or procedural nature;

or whose environmental effects are too broad, speculative, or conjectural to lend

themselves to meaningful analysis and will later be subject to the NEPA process, either

collectively or case-by-case."  43 C.F.R. § 46.210(i).  Section 304(g)(1) of ANILCA

requires the Secretary to "from time to time" revise its CCP for the Kenai Refuge, which

was previously adopted in 1985 and revised in 2010.

   E.    Any flaw in the Service's NEPA approach is harmless.

   The Kenai Plaintiffs' "extraordinary circumstances" argument should be rejected

because the Service's lack of a document analyzing those circumstances was, at most,

---

[13] Although the Kenai Plaintiffs claim that the Service has not documented its NEPA
analysis, the Kenai Rule itself documents the Service's NEPA analysis.  *See* FWL13575.

harmless error. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error."). Had the Kenai Plaintiffs timely raised their concerns about "extraordinary circumstances" analysis, the Service could have compiled its analyses regarding extraordinary circumstances into a formal comment response.

In any event, the Service considered the factors underlying extraordinary circumstances, even if those considerations were not compiled under the heading "extraordinary circumstances." For example, the Kenai Plaintiffs incorrectly claim that the Service failed to consider the "highly controversial" nature of the Kenai Rule, as demonstrated by comments submitted in opposition to the rule. Mot. 34–35. But the Service plainly considered the level of controversy generated by the Kenai Rule, expecting it "to be *moderately* controversial as the State of Alaska and some affected user groups will likely oppose some of aspects of the rule." FWL4690 (emphasis added). The Service also noted that the proposed rule received a "quiet roll-out" with "no media or public calls." FWL8749. Because the Service considered the allegedly absent extraordinary circumstance, the Kenai Rule should be upheld. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983) ("We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (quoting *Bowman Transp. v. Ark.–Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

The record on its face also demonstrates that the Kenai Rule would not have "highly controversial environmental effects" within the meaning of NEPA's implementing regulations or the Service's NEPA procedures. There is no significant controversy regarding the size, nature, or environmental effect of the firearm discharge

provisions.  *Compare* FWL13566 (the Kenai "rule expands the restriction on discharge of firearms on the Refuge by just under 4,000 acres, or approximately 0.2 per cent of lands in the Refuge currently open to hunting of moose, black bear, and brown bear")*, with* FWL8982 (Safari Club comment opposing firearm discharge restriction while providing no argument or evidence about the *environmental effects* of that restriction), *and* FWL8988–89 (same for State).  Because no "substantial dispute exists as to [the Kenai Rule's] size, nature, or effect" on the environment, it is not controversial within the meaning of NEPA.  *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997) ("Controversy does not refer to the existence of opposition to a use.").[14]

Because the Service analyzed the relevant factors, its failure to document that analysis in a formal extraordinary circumstances analysis "is not the type of error that requires a remand" since it had "no bearing on the final agency action."  *Nat'l Ass'n of*

---

[14] The Kenai Plaintiffs also claim at various points that the Kenai Rule is extraordinary for violating State law or creating a precedent for federal intrusion.  *See* Mot. 34–37. None of these arguments has merit.  The Kenai Rule does not create a precedent for violating state law; it maintains longstanding practices on the Kenai Refuge, consistent with the Service's longstanding approach of coordinating with the State to manage hunting on the refuge, while preserving its authority to adopt more restrictive regulations. *See supra* pp.6–7 (discussing how the Service rejected the State's proposal for a general entry hunt on the Skilak WRA in favor of a limited, youth-only hunt).  And it is hard to see how maintaining decades-old management approaches on Skilak WRA creates any sort of precedent.

Similarly, the Kenai Rule is not extraordinary for having "unknown environmental risks," as the Kenai Plaintiffs claim.  *See* Mot. 36.  The only unknown environmental risk they identify is the impact of "interfering with the State's management determinations."  *Id.* But the Kenai Plaintiffs do not explain how maintaining longstanding hunting practices on the Kenai Refuge—albeit in federal rather than state regulations—creates any unknown environmental risk.

*Home Builders*, 551 U.S. at 659 (finding that an inaccurate Federal Register notice stating that Endangered Species Act consultation was "required" was harmless error when consultation had already occurred).  In the Ninth Circuit, "consistent caselaw" has held that "'harmless error' requires a determination that the error 'had no bearing on the procedure used or the substance of [the] decision reached.'" *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011).  In *Kazarian v. U.S. Citizenship & Immigration Servs.*, 596 F.3d 1115, 1122 (9th Cir. 2010), for example, the Citizenship and Immigration Service denied an application for an extraordinary ability visa based on an erroneous interpretation of its own regulations, but had it interpreted its regulations properly, a denial still would have been appropriate.  The Ninth Circuit held that the Service's denial of the application was harmless error.  *Id.*; *see also Nevada v. United States*, 221 F. Supp. 2d 1241, 1247 (D. Nev. 2002) (failure to publish notice of pending trust acquisition was harmless error because the State was nonetheless able to challenge the trust acquisition).  Similarly here, the Service in fact analyzed the relevant factors, and the record on its face demonstrates that no extraordinary circumstances were present.  Thus, this Court, as in *Kazarian*, should hold that a failure to articulate a formal finding of no extraordinary circumstances was at most harmless error.

## CONCLUSION

For the foregoing reasons, the Kenai Plaintiff's summary judgment motion should be denied and summary judgment should be entered for Federal Defendants.

Respectfully submitted this 9th day of March, 2020.

PRERAK SHAH
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

*/s/ Michael S. Sawyer*
MICHAEL S. SAWYER
Trial Attorney
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-514-5273 || 202-305-0506 (fax)
Michael.Sawyer@usdoj.gov

*Counsel for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2020, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

/s/ *Michael S. Sawyer*
MICHAEL S. SAWYER

*State of Alaska v. Bernhardt,* Case No. 3:17cv13 (SLG)
FWS Kenai Rule                                                              48
Case 3:17-cv-00013-SLG   Document 179   Filed 03/09/20   Page 56 of 56